A lucid narrative of the entangled events out of which this cause has arisen defies conciseness. The *Page 46 
sequence of occurrences during a span of more than forty years must be related to intelligibly display the problem now projected for solution.
The parcel of real estate which the complainants as executors under the will of Marion S. Gane, deceased, have recently agreed to convey to the defendant Blanche G. Lavine may be identified as No. 103 East Hanover Street in the City of Trenton, New Jersey. The genesis of the present controversy is found in a deed executed on November 12th, 1898, by one Edward H. Stokes and his wife, Permelia S. Stokes, in which they granted and conveyed the premises to their son Edward A. Stokes "for and during the term of his natural life." The habendum clause reads as follows:
"To have and to hold all and singular the above described premises with the appurtenances unto the said Edward A. Stokes for and during the term of his natural life — and the said party of the first part do, by these presents, upon the decease of the said Edward A. Stokes give, grant, alien, remise, release, convey and confirm the reversion and remainder of the above described premises unto the lawful issue of the said Edward A. Stokes, their heirs and assigns forever as tenants in common."
Perhaps it will be more illuminating to impart at this juncture the information that the grantee, Edward A. Stokes, never married and died on March 6th, 1939, without lawful issue.
Resuming the chronological narrative, we learn that Edward H. Stokes, the grantor named in the deed, died on February 17th, 1900. Surviving him were his widow, Permelia Sargent Stokes, the son, Edward A. Stokes, another son, John W. Stokes, and a daughter, Marion Stokes Swan, who subsequently married Frederick Gane.
Edward H. Stokes, in his own writing, prepared and executed a will dated February 10th, 1870, and a codicil bearing date November 22d 1881, both of which were duly probated. By his will, after numerous bequests and devises, he declared:
"Sixteenth. I do further give devise and bequeath to my wife Permelia Sargent Stokes, all of the residue of my estate not otherwise *Page 47 
mentioned in this my last Will and Testament, after paying therefrom the Legacies and other matters before named in this my last Will and Testament, Including my funeral charges and what expenses that may accrue in my sickness * * *."
The testator, however, employed a codicil (tenth clause) to exclude from the operation of the residuary clause of his will all bonds and mortgages of which he had not made previous disposition and entrusted them to Lewis Parker, Jr., to pay the income therefrom in equal shares to the testator's three children for the terms of their natural lives, and upon the decease of any or all of testator's children, then to pay a one-third equal part of the principal to their lawful heirs. Then, in the next succeeding clause in his codicil, he provides:
"Eleventh. And whereas, by clause Seventeenth of my above mentioned last Will and Testament I direct `my Executors to sell at Public sale, within one year after my decease, all my real estate, which I have not in this my Will and Testament made disposition or mention of' — I do hereby, in order to prevent confusion or misinterpretation of my intention, expressly declare, that such real estate was not intended by me to be a part of the residue of my estate, as disposed of in Clause Sixteenth of my said last Will and Testament, but it is to be expressly excepted therefrom, and the proceeds derived from such sale I direct my executors to pay to my said wife Permelia Sargent Stokes."
On May 22d 1914, the death of Permelia Sargent Stokes ensued. The two sons, Edward A. Stokes and John W. Stokes, and the daughter, Marion Stokes Gane, survived. Mrs. Stokes died testate and a provision of her will, incidentally relevant, should be set forth:
"I give, devise and bequeath all my real and personal estate not hereby otherwise disposed of unto my Trustee upon Trust, that my Trustee shall sell, call in and convert into money the same or such part thereof as shall not consist of money, and shall with and out of the money produced by such sale calling in and conversion, and with and out of my ready money, pay all my just debts, funeral and testamentary expenses; and upon further trust, that my Trustee shall divide the residue of such money into three equal parts or shares, one of such third part or share to be paid to my daughter, Marion H. Swan absolutely; and one other of such third part or share to be paid to my son Edward A. Stokes absolutely; and the remaining third part or share to be invested by my said Trustee, and the income arising from such investments to be paid semiannually to my son *Page 48 
John W. Stokes during the term of his natural life, and immediately after the death of my son John W. Stokes, then said share shall be divided equally between my daughter, Marion H. Swan and my son Edward A. Stokes, their heirs and assigns forever."
Next came the death of John W. Stokes on August 13th, 1936. He was a resident of the State of Pennsylvania. The following testamentary disposition is discovered in his will:
"Sixth. All the rest and residue of my property, real, personal or mixed, of what nature and kind shall be invested for benefit of Emily R. Bachman of Allentown, Penn. In case of her death before me — it is to go to the B.P.O. Elks 105, Trenton, N.J., Crippled Kiddies."
 * * * * * * * *
"In reference to clause sixth of above, means that any property, real personal, or otherwise, to be sold and same to go to Emily R. Bachman or in case of her death, same to go to B.P.O. Elks No. 105, Trenton, N.J., outright."
On May 24th, 1915, John W. Stokes, by means of an appropriate proceeding in New Jersey, adopted as his daughter the present defendant, Gertrude Stokes Harloff. Emily R. Bachman has entered an appearance in this cause.
Meanwhile, Edward A. Stokes, by virtue of his deed, continued to retain the usufruct of the premises, and on October 16th, 1936, he let the property to the defendant National Properties, Inc., for a term of twenty-four years. As previously related, he died testate on March 6th, 1939, and his executors, supposing that upon the death of Edward A. Stokes the fee to the premises passed to his sister, Marion S. Gane, conveyed the premises to her. His will conferred the following power upon his executors:
"I also give to my said executors and trustees, full power to sell and convey from time to time, at public or private sale, for such price and upon such terms as they may consider advisable, in their discretion, any part or all of my said real estate, and any interest therein, and to make good and sufficient conveyances thereof."
The will also contains a residuary clause.
Then on November 28th, 1940, Marion S. Gane succumbed. Her will is dated November 5th, 1936, and modified by codicils *Page 49 
executed on March 21st, 1939, and January 19th, 1940. She, too, was a resident of Pennsylvania at the time of her death. A record of the probate of her testaments has been filed in the surrogate's office of Mercer County, New Jersey. Her will, in which she nominated her son, Charles E. Swan, and Fidelity-Philadelphia Trust Co. her executors, ordained:
"Eighth: All the rest, residue and remainder of my estate, of whatsoever kind and wheresoever situate, I give, devise and bequeath unto my husband, Frederick Gane, his heirs, executors or administrators."
Her codicil, however, directed:
"In the event that my residuary estate shall exceed the amount of Fifty thousand dollars ($50,000) then instead of giving to my husband, Frederick Gane, the entire residuary estate as provided in the Eighth Paragraph of my said will, I give, devise and bequeath unto him the sum of Fifty thousand dollars ($50,000) absolutely, and I direct that the remainder of my residuary estate shall be divided into two equal parts, one of which I give, devise and bequeath unto my daughter, Marion Swan Wilson absolutely and the other thereof unto my daughter-in-law, Eliza Swan, wife of my son, Charles E. Swan absolutely if she shall then be living, but in the event that she shall then be deceased to the children of my son, Charles E. Swan, who shall then be living, to be divided among them equally, share and share alike."
The final codicil may be described as a revocation by the testatrix of the bequest to her daughter-in-law, Eliza Swan, and in substitution the testatrix gave one-half of the remainder of her residuary estate to the complainant, Fidelity-Philadelphia Trust Company, in trust, to divide the same into three equal shares and to pay the income from one of the three shares to her grandson, Charles R. Swan, until he attained the age of thirty years, at which time he was to be paid the principal of the trust, and in the event he died before arriving at the age of thirty years, then the principal was to be paid to his children then living, in equal shares, and if he left no children surviving him, then the principal was to become a part of the trusts which, by the same instrument, she created in favor of her granddaughters, Elizabeth R. Swan and Jane Munro Swan. Trusts of a similar character and purport were created in respect of the other one-third *Page 50 
shares in favor of each of the granddaughters, Elizabeth R. Swan and Jane Munro Swan.
The testatrix, Marion S. Gane, conferred the following powers upon her trustee:
"(c) To sell and dispose of all or any part of the investments, securities, real and personal property which may from time to time comprise the principal of the said trust, either at public or private sale for such prices and upon such terms as to my said trustee may seem fit and proper; to make, execute and deliver to the purchasers thereof good and sufficient deeds of conveyance therefor, and all assignments, transfers and other legal instruments necessary or convenient for passing the title and ownership thereto, free and discharged of all trusts, without liability on the part of the purchasers or on the part of any corporation whose securities may be sold or disposed of or of any transfer agent thereof to see to the application of the purchase money or to inquire into the continuance of the trusts."
The proximate reason for litigation is the refusal of the defendant Blanche G. Lavine to accept a conveyance of the East Hanover Street real estate pursuant to a contract of sale made with her on March 5th, 1941, by the complainants, as executors
and trustees of the last will of Marion S. Gane, deceased, and Marion S. Wilson, who is the daughter of Marion S. Gane. Affirming her desire to acquire the premises in accordance with the terms of the contract, the defendant Lavine skepticizes the title of the testatrix, Marion S. Gane, and consequently the power of her executors (and trustees) to convey the fee.
The consideration of the issues here raised by the parties must begin with a construction of the deed from Edward H. Stokes etux. to his son Edward, dated November 12th, 1898. An examination of the language of the deed (Northeastern Tel. and Tel. Co. v.Hepburn, 73 N.J. Eq. 657; 69 Atl. Rep. 249; Adams v. Ross,30 N.J. Law 505, 510) and particularly the granting and habendum
clauses (Havens v. Sea-Shore Land Co., 47 N.J. Eq. 365;20 Atl. Rep. 497; Sellick v. Jersey Central Power and Light Co.,124 N.J. Law 110; 11 Atl. Rep. 2d 137), in view of the facts existing and the law effective at the time of its execution and delivery (Graves v. Fancher, 81 N.J. Eq. 407, 409;88 Atl. Rep. *Page 51 170; affirmed, 81 N.J. Eq. 517; 88 Atl. Rep. 172) impels the conclusion that the deed granted to Edward A. Stokes an estate in the premises for his life with a remainder in fee to his lawful issue. The language is plain and the intention of the grantors is manifest. This grantee then had no lawful issue and thus the persons who might take the remainder in fee were not in being and uncertain. The remainder was accordingly contingent. Kahn v.Rockhill, 132 N.J. Eq. 188; 28 Atl. Rep. 2d 34. The suggestion that the rule in Shelley's case to the extent then prevailing operated to vest in the grantee an estate in fee-simple, cannot be adopted. There is a conspicuous absence of words of inheritance. 2 Bl. Com. 114; Adams v. Ross, supra;
secondly, the remainder is regarded as contingent as to persons.Tantum v. Campbell, 83 N.J. Eq. 361; 91 Atl. Rep. 120.
This inspires an inquiry into the character of the estate, if any, which continued to remain in the grantor, Edward H. Stokes. One might choose to style it a "reversion expectant" or "incorporeal reversion" or "possibility of reverter." Technically these terms are inapt and I shall regard it as a reversion. A reversion has been defined as "a future estate created byoperation of law to take effect in possession in favor of a lessor or a grantor or his heirs, or the heirs of a testator, after the natural termination of a prior particular estate leased, granted or devised." 2 Reeves on Real Prop. ¶ 863.
Sir Edward Coke described a reversion to be the returning of lands to the grantor or his heirs after the grant is over. 1Institutes 142. "A future estate may be indirectly created by giving livery of seisin for one or more life estates, without an ultimate remainder in fee. The estate remaining in the former owner ready to come into possession on the termination of the life estate or estates is a reversion. The same result isreached when an ultimate remainder in fee is contingent. Until itvests, there is a reversion in the feoffer and his heirs."
(Emphasis supplied.) Gray, The Rule Against perpetuities (4thed.) § 11. A reversion is never created by deed or writing, but arises from operation of law. 2 Bl. Com. 175; Tiffany, RealProp. ¶ 135; Todd v. Jackson, 26 N.J. Law 525, 540. "A remainder has its origin in express grant; *Page 52 
a reversion merely arises incidentally, in consequence of the grant of the particular estate. It is created simply by the law, whilst a remainder springs from the act of the parties."Williams, Real Prop. (23d ed.) 362.
Where did the reversion or inheritance sojourn intermediate the creation of the contingent remainder by the deed of conveyance and the death in 1939 of the life tenant without lawful issue? In the solution of this point of inquiry, two dissimilar rules of law are perceptible. True, where the contingent remainder is created by devise (and formerly by use), the inheritance or fee (constituting the reversion) resides in the testator who can dispose of it, otherwise it descends to his heirs where it remains until the occurrence of the contingency which takes it from them. Fearne Cont. Rem. 351; 4 Kent Com. 257. The authorities are harmonious in their fidelity to this rule.33 Am. Jur. 532 § 72.
Where, however, the contingent remainder is created by commonlaw conveyance, as in the instant case, the authorities diverge.1 Tiffany on Real Prop. (2d ed.) ¶ 141; 33 Am. Jur. 532 §73. Some, probably the majority of the early cases, have inclined to pursue and apply the rule that the inheritance or fee is meanwhile in abeyance, in nubibus, in gremio legis. 2 Bl.Com. 102; 2 Prest. Abstracts 101-107; Cornish Rem. 175-178;Bohon v. Bohon, 78 Ky. 410. Others have preferred to adhere to the rule pertaining to contingent remainders created by use or devise and hold that the inheritance or reversion abides in the grantor until the remainder vests. Fearne Cont. Rem. 360;Williams, Real Prop. (21st ed.) 359.
The majority view has been criticised by Mr. Fearne. He avowed that the inheritance or fee or reversion should remain with the grantor or the testator until it could vest in the grantee in remainder. He perceived no reason why the rule as to the abode of the inheritance should not be uniform whether the contingent remainder be created by way of use, devise or common law conveyance. His disapprobation of the so-called common law rule and his advocacy of the contrary view display a pattern of eloquent legal logic quite worthy of reproduction here. *Page 53 
"These opinions are founded on an assumption that the remainder must pass out of the donor at the time of the livery; and, consequently that no estate shall remain in him after such livery; and therefore in the case of a lease to one for life, remainder to right heirs of J.S.; the remainder, they tell us, is in abeyance, or in nubibus, or in gremio legis; though by way of some sort of compromise between common sense, and the supposition of an estate passing out of a man, where there is no person in rerum natura, no object besides hard and hardly intelligible words for the reception of it, at the time of the livery; they are compelled to admit such a species of interest to remain in the grantor, as upon the determination of the estate before the contingent remainder can take place, entitles the grantor or his heirs to enter and reassume the estate. * * * It must be an object of no small curiosity, to understand how a remainder can pass from a donor until there exists some donee to receive it of him; if it passes at all, the conclusion rather seems to be, it passes to somebody; and whilst it does not pass to anybody, one might suppose it does not pass at all. And, however profound a solution of this difficulty may be discoverable by adepts in legal lore, under the expressions, `in abeyance,' `in nubibus' or `in gremio legis,' I cannot but think it a more arduous undertaking to account for the operation of a feoffment or conveyance, in annihilating an estate of inheritance, or transferring it to the clouds, and afterwards regenerating or recalling it at the beck of some contingent event, than to reconcile to the principles, as well of common law as of common sense, a suspension of the complete or absolute operation of such feoffment or conveyance, in regard to the inheritance, till the intended channel for the reception of such inheritance comes into existence; in any case at least, where a present state of freehold passes in the meantime, as the immediate and initiate subject of the operation of such conveyance. * * * To whom, then could it ever have passed out of the grantor? And from whom could it ever return to him? Where is the sense, in saying, a remainder must pass out of the grantor, in a case where you deny it ever passed at all to the grantee or anybody else? Or that livery must have its immediate operation, in a case where it is admitted to have left the estate in the same plight exactly as if it had never been made at all. Would there not be better sense in considering the disposition itself, in all these cases, as put in suspense, till the event or contingency referred to decides its effect? What is there to move the subsisting estate in the lands from the grantor, before the alienation of it takes effect? That alienation may indeed rest in abeyance or expectation, till the contingency or future event gives it operation. And it is that, rather than the respited inheritance, to which, during its mere potential undecided operation, the allusion of — caput inter nubila condit — seems most applicable." Fearne Cont. Rem. pp. 360-361-362-363.
He concludes as follows:
"In short, to bring this doctrine to the test of common reason, we may state it thus: A man makes a disposition of a remainder or *Page 54 
future interest, which is to take no effect at all until a future event or contingency happens; it is admitted that no interest passes by such a disposition to anybody, before the event referred to takes place. The question is, what becomes of the intermediate reversionary interest, from the time of the making such future disposition until it takes effect. It was in the grantor or testator at the time of making such disposition; it is confessedly not included in it. The natural conclusion seems to be, that it remains where it was, viz., in the grantor or the testator and his heirs, for want of being departed with to anybody else. * * * When the future disposition takes effect, then the reversionary or future interest passes pursuant to the terms of it; but if such future disposition fails of effect, either by reason of the determination of the particular estate, failure of the contingency, or otherwise; what is there then, to draw the estate, which was the intended subject of it, out of the grantor or his heirs, or the heirs of the testator?" FearneCont. Rem. p. 363.
The rationality of Fearne's thesis is generally acknowledged; its repudiation is seemingly inspired by a reluctance to depart from a pristine rule which, as Mr. Kent remarks, "deduces its lineage from high antiquity." 4 Kent's Com. 260; see, also,19 Am. Jur. 473 § 14.
Where contingent remainders have been created by devise, the courts of our state have esteemed the commonly accepted rule that the reversion reposes in the testator who may dispose of it and if not so disposed of, it descends to the testator's heirs where it remains until it deserts them by reason of the happening of the designated contingency. Holcomb v. Lake, 24 N.J. Law 686;affirmed, 25 N.J. Law 605; Vreeland v. Van Ryper, 17 N.J. Eq. 133; Mulford v. Mulford, 42 N.J. Eq. 68; 6 Atl. Rep. 609;Voorhees v. Singer, 73 N.J. Eq. 532; 68 Atl. Rep. 217; In rePeterson, 85 N.J. Eq. 135; 95 Atl. Rep. 613.
Frankly, I have not confronted any expression in any of our own decisions indicative of the rule which is to be regarded as preferable in our jurisdiction in a case, such as this, where the contingent remainder is created by a conveyance. Evidently, a freedom to adopt either rule is not abridged by any precedent in our reports. The view disseminated by Fearne dispels the fictions of the early common law and assuredly is the logical, practicable, and liberal one. See Pinkney v. Weaver, 216 Ill. 185; 74 N.E. Rep. 714. It does not clash *Page 55 
with the familiar principle that the fee must always be vested in someone. A freehold in abeyance was characterized by Vice-Chancellor Green in Bonnell v. Bonnell, 47 N.J. Eq. 540,547; 20 Atl. Rep. 895, as "a condition which violates fundamental principles of law."
It is therefore resolved that the reversion resulting from the creation of the life estate and contingent remainder, endured in the grantor, Edward H. Stokes. There was then a fixed ownership of it, although the possession was postponed. 2 Reeves, RealProp. ¶ 863. To whom and by what means did the reversion move upon the death of this grantor? If vested in the grantor, it could have been devised by his will and in the absence of any specific reference to it, it might have been embraced by a general residuary clause. Vreeland v. Van Ryper, supra; Den
v. Creveling, 25 N.J. Law 449, 452; 1 Jarman on Wills ch. 21 pp.588, 594. The statute (R.S. 46:3-7) would not have prohibited a disposition of the reversion. The person or persons in whom the reversion did vest were the grantor and his heirs. The application of the statute is therefore lacking. Nor would the fact that the grantor, Edward H. Stokes, did not have sole title to the premises at the time he executed his will and codicil, have prevented him from effectively disposing of the reversion by his will. A testamentary disposition may extend to all the estate which the testator might own at the time of his death. Fluke v.Ex'rs of Fluke, 16 N.J. Eq. 478; Revision of 1877 p. 1248 ¶ 24,
now part of R.S. (1937) 3:2-14.
An examination of the will and codicil of Edward H. Stokes fails to disclose a specific devise of the reversion, and the sixteenth and seventeenth clauses of his will, expressly qualified as they are by the tenth and eleventh clauses of his codicil, are persuasive that the testator intended to exclude all real estate from the operation of the residuary clause. Where the testator has confined his gift of residue to a particular part of his estate and has excluded another part, the part intended to be excluded will not pass under the gift of residue. Roy v.Monroe, 47 N.J. Eq. 356; 20 Atl. Rep. 481; Tindall's Ex'rs v.Tindall, 24 N.J. Eq. 512.
The seventeenth clause of the will "directs" his executors *Page 56 
to sell the real estate within one year after testator's death. The eleventh clause of the codicil instructs the executors to pay the proceeds derived from the sale of the real estate to the testator's widow, Permelia Sargent Stokes.
The pertinent clauses of the will and codicil merely clothe the testator's executors with a naked power to sell. The real estate is not devised to the executors to sell. "The distinction resulting from the authorities appears to be this: that a devise of the land to executors to sell passes the interest in it; but a devise that executors shall sell the land or that lands shall be sold by the executors gives them but a power." 1 Williams onExecutors 490; see, also, Moores v. Moores, 41 N.J.L. 440; 1Sudgen on Powers 131; Kent Com. 420; 1 Powell on Devises 233.
Another question consequently intrudes. Did these testamentary directions thus imposed upon the executors design and accomplish an equitable conversion of the reversionary interest and if so — then what?
"Equitable conversion may be defined as that constructive alteration in the nature of property whereby, in equity, real estate is considered for certain purposes as personalty, or viceversa, and is transmissible and descendable as such. It is a mere fiction resting upon the principle that equity regards things which are directed to be done as having actually been performed where nothing has intervened which ought to prevent such a performance. * * *" 19 Am. Jur. 2 § 2; Roy v. Monroe,47 N.J. Eq. 356, 359; 20 Atl. Rep. 481.
The neglect, failure or refusal of executors to complete the conversion within the stated period of time will not (certainly in all circumstances) defeat the objects of the conversion. The intent of the testator must be ascertained. Brearley v.Brearley, 9 N.J. Eq. 21. The test is whether the limitation or specification of time is directory merely or is of the essence of the power conferred. Where it is merely directory, the power to sell may be executed after the expiration of the prescribed period. Marsh v. Love, 42 N.J. Eq. 112; 6 Atl. Rep. 889;Chasmar v. Bucken, 37 N.J. Eq. 415; Brearley v. Molten,62 N.J. Eq. 345; 50 Atl. Rep. 317; Perry on Trusts 777. *Page 57 
The clause in the will pertaining to the power to sell the real estate is composed in these words:
"It is my will and testament and I direct my executors to sell at public sale within one year after my decease all my real estate which I have not in this my will and testament made disposition or mention of and that my executors settle up my estate as speedily as it possibly can be for the interest of my estate."
The specification of time was only directory. The testator desired to liberate his widow from the burdens incident to the maintenance and supervision of real estate and to give to her the equivalent of the real estate in the form of cash. The direction to sell was the method selected by him to fulfill that purpose. If, then, the time stated by the testator was not intended as a boundary of the power, the comment of Sir Joseph Jeykle inLechmore v. Earl of Carlisle, 3 P. Wms. 211, 215, is apt:
"The forebearance of the trustees in not doing what it was their office to have done shall in no sort prejudice the cestuique trustent, since at that rate it would be in the power of trustees, either by doing or delaying to do their duty, to effect the right of other persons, which can never be maintained. Wherefore the rule in all such cases is, that what ought to have been done shall be taken as done; and a rule so powerful it is as to alter the very nature of things — to make money, land and on the contrary to turn land into money."
The general rule ordains that if the will requires the real estate to be converted into money at all events, it must be considered as converted into money from the death of the testator. Wurts' Ex'rs v. Page, 19 N.J. Eq. 365, 376;Westfield Trust Co. v. Beekman, 97 N.J. Eq. 140;128 Atl. Rep. 791; affirmed, 99 N.J. Eq. 435; 131 Atl. Rep. 924; PhiladelphiaHome, c., v. Philadelphia Savings Fund, 126 N.J. Eq. 104, 115;8 Atl. Rep. 2d 193; affirmed, 129 N.J. Eq. 243;19 Atl. Rep. 2d 349.
It is the well settled rule in our state that where land is directed to be converted into money by the executors and the proceeds distributed in a manner designated by the testator, *Page 58 
such proceeds are to be regarded as gifts of money to the distributees and not as devises of real estate. Scudder v.Vanarsdale, 13 N.J. Eq. 109, 113; Fluke v. Fluke, supra;Cook's Executor v. Cook's Administrator, 20 N.J. Eq. 375, 377;Hand v. Marcy, 28 N.J. Eq. 59, 65; Clark v. Denton, 36 N.J. Eq. 419; affirmed, sub nom. Denton v. Clark, 36 N.J. Eq. 534;Brown v. Fidelity Trust Co., 82 N.J. Eq. 323; 87 Atl. Rep. 222;Isenburg v. Rose, 99 Atl. Rep. 615; Cranstoun v. Westendorf,91 N.J. Eq. 34; 108 Atl. Rep. 776; Triplett v. Ivins (Courtof Errors and Appeals), 93 N.J. Eq. 202; 112 Atl. Rep. 509.
It is also determinate that until the power of sale is exercised the legal estate descends to and vests in the heirs-at-law of the testator as tenants in common, such heirs taking the legal title charged with the trust created by the will. Herbert v. Executor of Tuthill, 1 N.J. Eq. 141, 147;Bergen v. Bennett, 1 Cr. Cas. 1, 16; S.C. 2 Am. Dec. 281, 285;Gest v. Flock, 2 N.J. Eq. 108, 113; Berrien v. Berrien,4 N.J. Eq. 37; Current v. Current, 11 N.J. Eq. 186; Fluke v.Fluke, supra; Todd v. Wortman, 45 N.J. Eq. 723, 725;18 Atl. Rep. 843; Morse v. Hackensack Savings Bank, 47 N.J. Eq. 279;20 Atl. Rep. 961; Bonnell v. Bonnell, 47 N.J. Eq. 540, 544;20 Atl. Rep. 895; Moores v. Moores, supra; Hopping v. Gray,82 N.J. Eq. 502; 89 Atl. Rep. 27; Triplett v. Ivins, supra;Brengel v. O'Toole, 103 N.J. Eq. 339; 143 Atl. Rep. 361; White
v. Brinkerhoff, 109 N.J. Eq. 553; 158 Atl. Rep. 525; Beck v.Dennis, 128 N.J. Eq. 128; 15 Atl. Rep. 2d 457.
In Morse v. Hackensack Savings Bank, supra, Mr. Justice Depue, expressing the opinion of the Court of Errors and Appeals, stated:
"The testator by his will made disposition of his entire estate, to be wrought out by the intervention of the power conferred upon his executor. He directed that his whole estate, real and personal, should be converted into money, and, after making provision for debts, funeral and testamentary expenses, and an annuity to his widow, he gave the residue of the proceeds of his estate in equal shares to his two children. The will containing no actual devise of lands, the *Page 59 
title and usufruct of the lands descended to his heirs-at-law, subject, nevertheless, to the power of sale and the trusts declared thereon contained in the will. The estate which the heirs took at the testator's death was an actual estate, which was alienable, devisable and descendable and liable to be seized and sold as lands; but when the power of sale was exercised, the estate of the heir or his alienee was determined, and the purchaser under the power became seized under the devisor by a title paramount to the title of the heir by descent."
This gradation of reasoning crystallizes the opinion that upon the death of the grantor. Edward H. Stokes, the reversion descended to his heirs-at-law, charged with and subject to the power of sale and the trust in respect of the proceeds created by the grantor's will. His heirs-at-law were Edward A. Stokes, John W. Stokes and Marion Stokes Gane. The power of sale bestowed upon the executors of Edward H. Stokes has not yet been exercised. It is a simple power of sale, and therefore it is transmissible to the present administrator cum testamento annexo. P.L. 1888 p.395; Comp. Stat. p. 2262 §§ 12, 13, 14; R.S. 3:17-11, 12, 13; as amended P.L. 1939 ch. 251 p. 665; Weimar v. Fath, 43 N.J.L. 1;Joralemon's Adm'r v. Van Riper, 44 N.J. Eq. 299;14 Atl. Rep. 479; Griggs v. Veghte, 47 N.J. Eq. 179; 19 Atl. Rep. 867; Ker
v. Banta, 71 N.J. Eq. 49; 63 Atl. Rep. 550; Cranstoun v.Westendorf, supra; In re Brooks, 106 N.J. Eq. 242;150 Atl. Rep. 568. Cf. Naundorf v. Schumann, 41 N.J. Eq. 14; 2 Atl. Rep. 609;Drummond v. Jones, 44 N.J. Eq. 53; 13 Atl. Rep. 611; Hegeman'sEx'rs v. Roome, 70 N.J. Eq. 562; 62 Atl. Rep. 392.
Ordinarily, such a power and express direction to sell does not lose its efficiency by mere lapse of time. Morse v. HackensackSavings Bank, supra; Hatt v. Rich, 59 N.J. Eq. 492;45 Atl. Rep. 969. See, also, Foley v. Devine, 95 N.J. Eq. 473;123 Atl. Rep. 248. The circumstance that the widow, Permelia Stokes, died before the conversion was consummated is not dispositive.Beck v. Dennis, supra. Whether the power of sale for any reason has become invalidated (Moores v. Moores, supra;Denton v. Clark, supra) is a subject which ought not be considered and determined until a *Page 60 
representative of the estate of Permelia S. Stokes is also before the court.
These conclusions, however, necessitate a denial of the prayer of the bill seeking a specific performance of the existing contract. All parties to the cause apparently favor a conveyance of the fee in the premises to the defendant Lavine for the purchase price proposed. Counsel should experience no difficulty in tracing the peregrinations of the legal title or estate of each heir in the reversion as governed by the respective testaments, save that of John W. Stokes which, although probated before the register of wills of Lehigh County in the State of Pennsylvania, does not appear from the exemplified record to have been executed in the manner and with the formalities prescribed by the law of this state in which this parcel of real estate is situate. Nelson v. Potter, 50 N.J. Law 324; 15 Atl. Rep. 375;Lindley v. O'Reilly, 50 N.J. Law 636; 15 Atl. Rep. 379;McCarthy v. McCarthy, 57 N.J. Eq. 587; 42 Atl. Rep. 332;Trenton Saving Fund Society v. Wythman, 106 N.J. Eq. 93;148 Atl. Rep. 622; 131 A.L.R. 1026, 1033. In the absence of a valid testamentary disposition of his interest in the reversion, it follows that as to it, John W. Stokes died intestate.
A comprehensive decree composed to effectuate the basic conclusions herein expressed may be presented upon notice to the several parties.
 SUPPLEMENTARY MEMORANDUM.
There are two circumstances which principally induce me to conclude that the power of sale conferred upon the executors of Edward H. Stokes, deceased, has not become superannuated. (1) The reversion by reason of its contingent character was not profitably marketable until the death, without lawful issue, of the life tenant, Edward A. Stokes, which did not occur until March 6th, 1939. (2) The invalidation of the power in the present case would create a diversion in the distribution of the proceeds contrary to the manifest intention of the testator, Edward H. Stokes.
A decree will be advised in conformity with this conclusion and those expressed above. *Page 61